**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MICHAEL GWYNN and BRENDON RYAN, | : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | No. 11-1128 |
| CITY OF PHILADELPHIA, CHARLES RAMSEY, MICHAEL KELLY, MELVIN SINGLETON, SALVATORE FEDE and FRANK PULOMBO, | : : : : | |
| Defendants. | : : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                **MARCH 28, 2012**

Presently before the Court is Defendants, City of Philadelphia (the "City"), Charles Ramsey,[1] Michael Kelly,[2] Melvin Singleton, Salvatore Fede, and Frank Palumbo's (collectively, the "Defendants"),[3] Motion for Summary Judgment against Plaintiffs, Michael Gwynn ("Officer Gwynn") and Brendan Ryan ("Officer Ryan") (collectively, the "Plaintiffs"). For the reasons set forth below, the Defendants' Motion for Summary Judgment will be granted in its entirety.

**I.      BACKGROUND**

Officer Gwynn and Officer Ryan are employed by the City of Philadelphia Police

---

[1] Charles Ramsey ("Commissioner Ramsey") is the Police Commissioner of Philadelphia.

[2] While Plaintiffs name Michael Kelly as a Defendant in this case, it is clear from the record that they are referring to Sergeant Patrick Kelly ("Sgt. Kelly") who is currently a lieutenant in the Philadelphia Police Department.

[3] Melvin Singleton ("Capt. Singleton") is a Captain at the 19th Police District ("19th District") in Philadelphia. Salvatore Fede ("Sgt. Fede") is a sergeant at the 19th District, and Frank Palumbo ("Lt. Palumbo") is a Lieutenant in this district. We note that Lt. Palumbo's name is spelled incorrectly (Pulombo) in the Complaint. However, we will refer to him with the correct spelling of his name.

Department ("PPD") as police officers.  (Compl. ¶ 13.)  On December 15, 2009, Plaintiffs were

assigned to the 19th District day shift.  (Defs.' Mot. Summ. J., Ex. 1 at 7.)  According to a

statement given to the Federal Bureau of Investigation ("FBI") on March 24, 2010, Keishawn

Artis ("Artis") claims that on December 15, 2009, at approximately 3:00 p.m., after leaving his

aunt's house located at 209 Gross Street in Philadelphia, he was stopped by Officers Gywnn and

Ryan.  (Id., Ex. 2.)  Artis states that he was walking with his brother, Leroy Britt ("Britt"), when

they were approached by Plaintiffs and asked to stop.  (Id.)  They did so, and Plaintiffs

immediately began a search of both men, with Officer Ryan searching Britt, and Officer Gwynn

searching Artis.  (Id.)  Artis states that during the search, Officer Gwynn intentionally grabbed

his crotch and back pocket to distract him while Officer Gwynn removed approximately $400 to

$600 in cash from his back pocket.  (Id.)  Artis claims that he received this money from his

employment at Laxton Enterprises Incorporated where he worked in trash removal.  (Id.)  After

Officer Gwynn finished his search, Artis immediately asked him to return the money to which

Officer Gwynn responded that he had not taken any money.  (Id.)  When Artis again asked for the

money, Plaintiffs departed.  (Id.)  Artis stated that he returned home and told a family member

that a police officer had stopped him and stolen his Christmas money.  (Id.)  The family member

called the police, described the incident and reported the allegation of theft.  (Id.)

        The phone call by the Artis family member resulted in an investigation being initiated by

the Internal Affairs Bureau ("IAB")  (Defs.' Mot. Summ. J., Ex. 3 at 4.)  Lt. Palumbo stated in an

Affidavit that he and Sgt. Fede were at the 19th District Station when IAB called to alert Capt.

Singleton that their investigators would be coming there in a few hours to investigate the

complaint made by Artis.  (Id. at 6.)  Capt. Singleton was not at the station when IAB called, and

Sgt. Fede contacted him and made him aware of the situation.  (Id.)  Before Capt. Singleton

arrived at the station, Plaintiffs returned from their street duty assignment.  (Id.)

Plaintiffs contend in their Complaint that upon arrival back at the 19th District, they were

"held in a room [sic] not allowed to communicate without [sic] others for up to Five [sic] and a

half hours.  During such time the Plaintiffs were search [sic] and the search included the removal

of parts of the Plaintiff [sic] clothing."  (Compl. ¶ 5.)  Plaintiffs further assert that "Defendant

Charles Ramsey order [sic] the Plaintiff to DRP[4] and off street duty because they brought a

grievance against the City of Philadelphia for being deprived of their free movement, liberty, and

for opposing a [sic] unreasonably [sic] search and seizure by Defendants Michael Kelly, Melvin

Singleton, Salvadore Fede and Frank Pulombo."  (Id. ¶ 8.)

Plaintiffs assert further that they were "intentionally placed in a room at the 9th [sic]

Police District," and "were not permitted by Defendants Michael Kelly, Melvin Singleton,

Salvadore Fede and Frank Pulombo to leave the room or to communicate with others, including

friends and family, for approximately five and a half hours.  Further, in [sic] this same time the

Plaintiffs were not permitted . . . to use their cell phone [sic] or contact others.  Gwynn was held

for four and a half hours; Ryan held for five and [sic] half hours."  (Id. ¶¶ 20-21.)  Plaintiffs

further aver that they protested the unreasonable search and seizure by filing a grievance with

their union, and that in retaliation for filing such, they were ordered to the DRP and removed

from street duty for five and one half months.  (Id. ¶ 22-23.)  Plaintiffs contend that this deprived

them of the opportunity to earn overtime pay for this period of time.  (Id. ¶ 23.)

---

[4]DRP refers to the Differential Response Unit which is located at PPD headquarters at 8th and
Race Streets in Philadelphia.

In Count I, Plaintiffs assert claims under 42 U.S.C. § 1983,[5] and under the First, Fourth, and Fourteenth Amendment.  Plaintiffs aver that they were:

> deprived under color of state law by Defendants . . . of such rights as: liberty, freedom from unreasonable seizures and search [sic], right not to be retaliated for engaging in Petition Clause activity, due process and association, such rights are secured under the First, Fourth, and Fourteenth Amendments of the United States Constitution, and without adequate or valid due process of law.

(Id. ¶ 33.)

In Count II, Plaintiffs assert a claim under the Fair Labor and Wage Act, 29 U.S.C. §§ 201, et seq., for the City's failure to pay them for the two and one half hours of overtime pay that they were entitled to when they were held in custody by Defendants.  (Id. ¶¶ 36-37.)  In Count III, Plaintiffs bring state law claims for false imprisonment and under Pennsylvania's Minimum Wage Act, 35 P.S. § 333.101 et seq.  (Id. ¶ 42-43.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or

---

[5]Section 1983 reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

42 U.S.C. § 1983.

whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

III.    **DISCUSSION**

1.    **Federal Claims**

    **A.  Petition Clause**

Plaintiffs assert that they engaged in "First Amendment Petition Clause activity" when they filed grievances with their union under a collective bargaining agreement between the union and the City against all Defendants over the December 15, 2009 incident in question.  (Compl. ¶ 27.)  They claim that the Defendants unlawfully retaliated against them for the filing of the grievances by assigning them to the DRP unit where they were not able to earn the same amount of overtime as they had earned while on street duty.  (Id. ¶ 23.)  These claims, however, fail for several reasons.

    We first point out that, logically, the sequence of events here does not support Plaintiffs' claims of retaliation.  Both Plaintiffs acknowledge that the very next morning after the incident in Capt. Singleton's office that they were assigned to the DRP.  Officer Gwynn testified that he was called by Sgt. Fede the next morning at "approximately 7 or 8 a.m.," and told to report to the DRP.  (Pls.' Resp. Mot. Summ. J., Ex. 1 at 94.)  Officer Gwynn further stated that he then called Officer Ryan and learned that Officer Ryan was told the same thing.  (Id. at 95.)  Neither Plaintiff testified that they first filed a grievance with their union before they were assigned to the DRP.  Thus, it follows that none of the Defendants could have unlawfully retaliated against the Plaintiffs by assigning them to the DRP because the assignments occurred before Plaintiffs filed their grievances with the union.

    Plaintiffs' retaliation claims also fail because the record indicates that Plaintiffs would have been assigned to the DRP whether or not they filed grievances with their union.  Capt.

Singleton testified at his deposition that all of the officers that had been accused of crimes in the 19th District since he has been captain were assigned to the DRP.  (Pls.' Resp. Mot. Summ. J., Ex. 7 at 92.)  Capt. Singleton explained that "DRP is something that when an allegation is made on an officer concerning a crime . . .  in the course of an Internal Affairs investigation, while Internal Affairs is investigating the officers are assigned to non policing duties."  (Id. at 93.)  Here, the Plaintiffs have failed to produce evidence of any officer in the 19th District, or any other district for that matter, that was not assigned to the DRP or similar off-street duty after being accused of a crime.  In addition, they have presented no evidence to support their position that Plaintiffs were assigned to the DRP in retaliation for any First Amendment Petition activity that they claim to have done after the incident.

However, most importantly, Plaintiffs' retaliation claims fail in light of the United States Supreme Court's decision in Borough of Duryea v. Guarnieri, 131 S.Ct. 2488 (2011).  In Duryea, the Court determined that  "[w]hen a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern."  Id. at 2493 (citing Connick v. Myers, 461 U.S. 138, 147 (1983)).  The Court further determined that even where the employee makes such a showing, courts must balance the employee's right to engage in speech against the government's interest in promoting the efficiency and effectiveness of the public services it performs through its employees.  Id.

The Court added that:

> The substantial government interests that justify a cautious and restrained approach to protecting public employees' speech are just as relevant in Petition Clause cases. A petition, no less than speech, can interfere with government's efficient and effective operation by, e.g., seeking results that "contravene governmental policies or impair the proper performance of

governmental functions."  Garcetti v. Ceballos, 547 U.S. 410, 419, 126
S.Ct. 1951, 164 L.Ed.2d 689.  A petition taking the form of a lawsuit
against the government employer may be particularly disruptive,
consuming public officials' time and attention, burdening their exercise of
legitimate authority, and blurring the lines of accountability between them
and the public.

* * * *

The framework used to govern public employees' Speech Clause claims,

when applied to the Petition Clause, will protect both the government's
interests and the employee's First Amendment right.  If a public employee
petitions as an employee on a matter of purely private concern, his First
Amendment interest must give way, as it does in speech cases.  San Diego
v. Roe, 543 U.S. 77, 82–83, 125 S.Ct. 521, 160 L.Ed.2d 410. If he
petitions as a citizen on a matter of public concern, his First Amendment
interest must be balanced against the government's countervailing interest
in the effective and efficient management of its internal affairs. Pickering,
supra, at 568, 88 S.Ct. 1731.[6]  If that balance favors the public employee,
the First Amendment claim will be sustained. If the balance favors the
employer, the employee's First Amendment claim will fail even though
the petition is on a matter of public concern.

Id. at 2495, 2500.

Plaintiffs argue that "reporting a violation of government laws is a matter of public

concern."  (Pls.' Resp. Mot. Summ. J. at 15.)  Plaintiffs argue that their filing of grievances with

their union in which they alleged illegal search and seizure is a matter of public concern.  We

disagree.

An employee's speech or petition clause activity involves a matter of public concern

where "it can be fairly considered as relating to any matter of political, social or other concern to

the community."  Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003) (quoting Baldassare v.

---

[6]Pickering v. Board of Ed. of Tp. High School Dist., 391 U.S. 563, 88 S.Ct. 1731 (1968).

New Jersey, 250 F.3d 188, 194 (3d Cir. 2001)).  Here, it is clear that Plaintiffs were not speaking as public citizens when they filed grievances with their union, but rather as employees voicing private concerns regarding how they were treated by their employer, i.e., whether they were improperly searched after being accused of theft.  Duryea also stated that "[a] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." 131 S.Ct. at 2501.  The Court further noted that "[t]he right of a public employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process. It is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts."  Id.

Moreover, even if we were to consider Plaintiffs' union grievances a matter of public concern, such must be balanced against the government's countervailing interest in the effective and efficient management of its internal affairs.  Duryea, 131 S.Ct. at 2500.  Under this balancing test, we find that the City and the PPD had a substantial "countervailing interest" in promptly investigating any police officer accused of a crime, especially a crime involving theft and dishonesty, to ensure the public of the integrity of its police department.  Thus, for all these reasons, the Plaintiffs' filing of grievances with their union is not an act protected under the Petition Clause of the First Amendment and, thus, summary judgment is granted in favor of all Defendants regarding these claims.

**B.      Section 1983 Claims Under the Fourth and Fourteenth Amendments**

Plaintiffs next assert that they were searched and seized without probable cause in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States.  To

prevail in a § 1983 action, a plaintiff must demonstrate that: "(1) the defendants acted under color of law; and (2) their actions deprived [the plaintiff] of rights secured by the constitution or federal statutes." Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997).  It is not disputed that the police conduct at issue was committed by persons acting under color of state law.  Thus, our focus will be on the first element- whether or not, viewing the evidence of record in a light most favorable to Plaintiffs, a reasonable jury could find that the Defendant officers' conduct violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the Constitution.  Defendants assert that they never searched Plaintiffs, and that Plaintiffs voluntarily consented to all requests regarding the money at issue.  Defendants further assert that because Plaintiffs were free to leave Capt. Singleton's office at any time, they were never seized.  (Defs.' Mot. Summ. J. at 11.)  We agree.

The Fourth Amendment prohibits unreasonable searches and seizures.  See Illinois v. Rodriquez, 497 U.S. 177, 183 (1990); Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009).  A search within the meaning of the Fourth Amendment occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984).  The Fourth Amendment provides protection to people, not places, and as such, it protects people from unreasonable intrusions into an individual's privacy.  Katz v. United States, 389 U.S. 347, 353 (1967).  To determine whether a person has a reasonable expectation of privacy, the individual must show that: (1) the person exhibited an actual expectation of privacy, and (2) that expectation is one that society is prepared to recognize as reasonable.  Id. at 363.

Public employees such as police officers are entitled to a reasonable expectation of

privacy in their place of work.  O'Connor v. Ortega, 480 U.S. 709, 717 (1987).  However, police officers generally have a diminished expectation of privacy compared to other government employees.  See Policemen's Benevolent Ass'n of N.J., Local 318 v. Washington Tp., 850 F.2d 133, 138 (3d Cir. 1988) ( "[P]olice officers may have lowered expectations of privacy because they have chosen to enter a highly regulated industry."); Carroll v. City of Westminster, 233 F.3d 208 (4th Cir. 2000) ("[C]ourts have long recognized that individuals in certain safety-sensitive professions, such as law enforcement, have a reduced expectation of privacy"); Brambrinck v. City of Philadelphia, No. 94-1673, 1994 WL 649342, at *13 (E.D. Pa. Nov. 15, 1994) ("[P]olice officers may sometimes have to lower their expectation of privacy in the context of their employment as police officers in whom the public has placed its trust.") (citing O'Connor v. Ortega, 480 U.S. at 717); McKenna v. City of Philadelphia, 771 F.Supp. 124, 127 (E.D. Pa. 1991) (discussing law enforcement as "an industry so intensely regulated that its employees' expectations of privacy are necessarily and predictably diminished").

In addition, The Supreme Court in O'Connor held that, "[p]ublic employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation."  Id. at 717.  Moreover, "[t]he employee's expectation of privacy must be assessed in the context of employment relations."  Id.  The question of whether a public employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.  Id. at 718.

The O'Connor Court also held that public employers need not show probable cause for noninvestigatory intrusions and investigations of work-related misconduct. 480 U.S. at 725.

11

Agreeing with the government employer's argument that a lesser standard was appropriate, the Court found:

> A standard of reasonableness will neither unduly burden the efforts of government employers to ensure the efficient and proper operation of the workplace, nor authorize arbitrary intrusions upon the privacy of public employees. We hold, therefore, that public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances.

Id. at 725-26.  In accordance with this case law, we find that Plaintiffs, as police officers, had a diminished expectation of privacy when they were questioned about the complaint against them in Capt. Singleton's office.  In addition, we find that a standard of reasonableness is to be utilized in considering the events that transpired and whether Plaintiffs' Fourth Amendment rights were violated.

As noted, Defendants assert that a search was never conducted of Plaintiffs.  However, viewing the facts at this summary judgment stage of the proceedings in a light most favorable to Plaintiffs, we will assume that Plaintiffs were searched for the missing money in question. However, for the reasons stated below, we find that Plaintiffs consented to any search that they claim took place, and they were not "seized" as they were free to leave Capt. Singleton's office at any time.  In addition, we find that the Defendants' actions in investigating the complaints made against Plaintiffs were reasonable under the O'Connor standard.

If a search is conducted without a warrant, such a search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One such exception is a search authorized by consent,

which may be expressed or implied.  Id. at 235.  "[W]e determine the voluntariness of a consent by examining the totality of the circumstances."  Price, 558 F.3d at 278; Schneckloth, 412 U.S. at 227.  We consider such factors as "age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment."  Price, 558 F.3d at 278; see Schneckloth, 412 U.S. at 226.  The "setting in which the consent was obtained [and] the parties' verbal and non-verbal actions " are also relevant.  Price, 558 F.3d at 278 (quoting United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003)).

Officer Gwynn testified at his deposition that after the stop of Artis, he and Officer Ryan were already heading back to the 19th District when Sgt. Fede called him on his cell phone and told the officers to return to the station.  (Pls.' Resp. Mot. Summ. J., Ex. 1 at 42-43).  There, Sgt. Fede informed them that a complaint had been made against them, and to wait in Capt. Singleton's office because Capt. Singleton was on his way and would be there in a few minutes.  (Id. at 49.)  Officer Gwynn stated that he and Officer Ryan waited "fifteen, 20 minutes, maybe" in Capt. Singleton's office before he arrived.  (Id. at 50.)  He also stated that, at this point, he did not feel like he was free to go as he was "ordered into the captain's office."  (Id.)  Officer Gwynn stated that when Capt. Singleton arrived, he told them that IAB would be there in twenty minutes, and that there was an allegation that they had taken money.  (Id. at 60.)  He testified that Capt. Singleton told them that "if we were to empty our pockets, our wallet and show that we didn't have the money that I believe he insinuated that we would be released and show Internal Affairs that we had no money."  (Id.)  He stated further that their jackets were searched and they were told to "bunny ear" their pockets by pulling them out and letting them hang out. (Id. at 61.)

13

They were also advised to "pull up our pants and pull down our socks to show that we had nothing in our socks." (Id. at 62.) Officer Gwynn added that "[e]verything we were told they kept saying this is good for you. This is going to help you in whatever this guy is saying." (Id. at 63.) Officer Gwynn stated that "as far as I'm aware of it's an order." (Id. at 64.) "I do what I'm told." (Id. at 65.) Officer Gwynn added that as a rookie cop he was intimidated by Capt. Singleton. (Id. at 67.) He felt he could not stop this because "[a]s far as I was aware I was under a direct order from the captain." (Id. at 69.) He stated that IAB arrived about a half an hour after Capt. Singleton's questioning ended. (Id. at 81.) He added that this whole interaction with Capt. Singleton from the time they entered his office until the time they were finished and IAB arrived, took about an hour. (Id. at 81.)

Officer Ryan reiterated much of Officer Gwynn's testimony at his deposition, and testified that he did not consent to be searched. Officer Ryan stated that he and Officer Gwynn were brought to Capt. Singleton's office by Sgt. Fede and told a complaint was made about them and that the captain was on his way. (Id., Ex. 2 at 26-27.) When Capt. Singleton arrived, he told them to sit down and relax, and that they had to wait for IAB to arrive. (Id. at 29.) Officer Ryan stated that Capt. Singleton told the officers that a complaint about money was made against them and asked them what kind of money did they have on them. (Id.) Officer Ryan stated that Capt. Singleton did not tell them that they should get a union representative or an attorney, and did not tell them that he would be a witness in any grievance hearing that might occur. (Id. at 31.) He stated that this meeting with Capt. Singleton took between a half an hour to an hour before IAB arrived. (Id. at 31.) Officer Ryan stated that Capt. Singleton did not tell them that either or both of them could leave if they wanted or could refuse to participate in the investigation. (Id. at 32.)

14

Officer Ryan testified that when Capt. Singleton told them to sit down in his office, he took that

to mean that they were not allowed to leave, nor could he refuse Capt. Singleton telling him to

empty his pockets and take off his jacket.  (Id. at 35.)  Officer Ryan added that he was under the

belief that Capt. Singleton could order him to consent to a search.  (Id.).

However, the evidence of record including affidavits, deposition testimony, and IAB

reports from or regarding Capt. Singleton, Sgt. Fede, Sgt. Kelly, and Lt. Palumbo indicate that

Officers Gwynn and Ryan were aware of their rights and freely consented to show Capt.

Singleton what they had in their pockets and their socks.  We are of the opinion that a reasonable

jury, viewing the evidence in a light most favorable to Officers Gwynn and Ryan, could not find

that any Defendant violated their Fourth Amendment rights.

Capt. Singleton submitted an Affidavit regarding his version of the incident.[7]  With

regards to what he stated to Officers Gwynn and Ryan upon his arrival at the 19th District, Capt.

Singleton stated:

> . . . I began to explain to them that for their protection, I wanted to know if
> they wanted to volunteer to show me the amount of money they had on
> them.  I had Lt. Palumbo and Sgt. Fede serve as witnesses to this event to
> ensure fairness to the Plaintiffs.  I offered to serve as their witness as their
> commanding officer concerning the amount of money they had on their
> person.  I even contacted another Lieutenant with specialized knowledge
> of search and seizure regulations and asked him whether I was permitted

---

[7]Plaintiffs spent a great deal of space in their Response arguing that the Affidavits submitted by the Defendants are a "sham" and "unreliable" because "there is a serious question about the formality used to obtain the affidavits."  (Pls.' Resp. Mot. Summ. J. at 2-5.)  Plaintiffs even question the credibility of the notary herself.  (Id.)  Defendants replied and submitted an Affidavit from the notary, Linda Busillo, stating that she was "physically present in my office on the 16th floor of the Philadelphia Law Department to witness Frank Palumbo, Salvadore Fede and Melvin Singleton each individually sign their own affidavits utilized in Civil Action 11-1128."  (Defs.' Reply to Pls.' Resp. Mot. Summ. J., Ex. 2.)  We find Plaintiffs' claims regarding the validity of the Affidavits to be completely without merit.

to ask the Plaintiffs to consent to this activity.  After being assured that I was, I explained to them their rights to get up and leave whenever they wanted to.  I did everything in my power to advocate for my officers and to let them know that they had no obligation to stay in my office.  I told them they were free to leave whenever they wanted and that I wanted to make sure that they were vindicated.

(Defs.' Mot. Summ. J., Ex. 1 at ¶ 3.)  In addition, Capt. Singleton testified at his deposition:

I told them specifically that this was completely voluntary.  I, in fact, as anyone that would walk in here would be able to tell you I explained to those officers what their rights are, what their rights were as citizens, plain and simple, that they can get up and walk out of my office at any time.  That what I'm asking them to do was for their protection.  That if you are willing to show me– you think that is a good idea to show me the amount of money that you have on you . . .   then I'll be willing to be a witness to the amount of money you have on them.  And I explained to them it was not an order, that it was completely a voluntary situation and the officers agreed.

(Pls.' Resp. Mot. Summ. J., Ex. 7 at 28-29.)  Moreover, when asked why he didn't wait for IAB to arrive to begin the investigation, Capt. Singleton responded:

My reasoning was that as their commanding officer, someone who was looking to protect them from and to give them an opportunity to be exonerated in the course of the investigation the opportunity to bring me in as a witness so I can say that these officers, in fact, did not have the specific amount of money that the gentleman was accusing them of.

(Id. at 35.)

Capt. Singleton was also asked how many times did he explain the officers' rights to them.  He responded:

I explained it to the extent that they said they understood my explanation . . . That it was completely voluntary, that it was completely something they could get up and walk out of my office on.  I know that I explained that to them at least one time.  At least one time they said that they completely understood.

16

(Id. at 38.)  This testimony is consistent with the statement that Capt. Singleton gave Lt.

Terrence Gibbs ("Lt. Gibbs") of IAB who conducted the investigation of the complaint against

Officers Gwynn and Ryan just three days after the incident on December 18, 2009.  In this

statement, Capt. Singleton stated that he "advised the officers of the allegations and their

contractual rights and the officers voluntarily consented to empty all their pockets."  (Id., Ex. 5 at

8.)  It is also consistent with the affidavits and deposition testimony of Sgt. Fede, Sgt. Kelly, and

Lt. Palumbo.

Sgt. Fede stated in his Affidavit that:

> I made it abundantly clear that they could voluntarily demonstrate what
> was in their pockets and voluntarily roll down their socks.  I only asked
> them to do that voluntarily.  I told them that if they did not want to
> voluntarily empty their pockets and roll down their socks they were free to
> leave.  Neither of the Plaintiffs ever voiced any opposition to being in the
> 19th District at any point on December 15, 2009.  Both Plaintiffs were
> paid for their overtime on that day for staying late.

(Defs.' Mot. Summ. J., Ex. 5 at 4.)

Sgt. Fede also stated in his Affidavit that "Gwynn and Ryan were repeatedly told that they

were free to leave at any point.  They understood that they had volunteered and consented to the

time they spent in Captain Melvin Singleton's office."  (Id., Ex. 5 at 10.)  Furthermore, Sgt. Fede

testified at his deposition that when Capt. Singleton arrived at the 19th District, Capt. Singleton

informed Officers Gwynn and Ryan that:

> there is a complaint against them of money missing from a person they
> stopped and that they have the option, the right to get up and walk out of
> his office right now, go get legal representation or call whoever you have
> to or sit there and we'll start the investigation.  And he's going to tell
> them, you know, what we need to do in order to start the investigation.

17

(Pls.' Mot. Summ. J., Ex. 7 at 46.)  Sgt. Fede stated that both officers said "yes" that they

understood what Capt. Singleton said to them.  (Id. at 48.)  Sgt. Fede stated further that:

> The captain tells them that I believe at this point that if they want to show
> him what they have in their pockets out of their own free will, they're not
> being told to, they're not being ordered to, that he would be their witness
> and document it for them so that when the investigation begins he can say
> they were in my building.  I saw them.  They – they showed me what they
> have.  They don't have this money.  And he says, you can refuse that any
> time you want.

(Id. at 49.)  Sgt. Fede added that:

> The captain repeated the request if they would voluntarily show the
> contents of their pockets and their belongings he would document it for
> them.  And if they didn't, they could just sit there and wait for Internal
> Affairs.  And they had the right to say no and just wait until the
> investigators showed up on the scene.

(Id. at 52.)  In addition, Sgt. Fede was asked: "How many times did the captain say that?"  He

responded "[a]pproximately two times.  Three times."  (Id. 52.)

Moreover, Sgt. Fede's Affidavit and deposition testimony are consistent with the

statement he gave to IAB on December 16, 2009, the day after the incident, regarding Capt.

Singleton informing Officers Gwynn and Ryan of their rights, and that they voluntarily emptied

their pockets to show what money they possessed.  The statement read that "Captain Singleton,

in the presence of Sgt. Kelly and Sgt. Fede, advised P/Os Gwynn and Ryan of the allegations and

of their legal/administrative rights.  P/Os Gwynn and Ryan voluntarily turned their pockets inside

out of their pants and patrol jacket."  (Id., Ex. 5 at 7.)

Lt. Palumbo testified at his deposition that: "I recall Captain Singleton making it very

clear to them that they did not have to cooperate with what he was going to ask them to do in

18

regards to money being taken." (Pls.' Resp. Mot. Summ. J., Ex. 6 at 97.)  Lt. Palumbo stated

that:

> Captain Singleton repeatedly told them that they did not have to go along
> with demonstrating what was in their pockets and their socks.  I reiterated
> that.  I think Sergeant Kelly may have even said that to them.  But I'm
> going to give what I think is an accurate estimation.  Something along
> those lines were said at least ten times by Captain Singleton and a
> combination of supervisors and Captain Singleton that it was voluntary
> that they demonstrate what was in their pockets and maybe their socks.

(Id. at 125-26.)  Lt. Palumbo's statement to IAB on December 16, 2009, like Capt. Singleton and

Sgt. Fede's statements, is also consistent with his deposition testimony.  Lt. Palumbo stated that

when Capt. Singleton arrived at the 19th District he "explained the situation, explained their

rights and the officers voluntarily consented to empty all their pockets."  (Id., Ex. 5 at 8.)

In addition, Sgt. Kelly's statement to IAB on December 16, 2009, corroborates the other

Defendant officers' statements and testimony regarding the voluntariness of Officers Gwynn and

Ryan showing the officers how much money they had on them while in Capt. Singleton's office.

He stated that in the presence of him, Capt. Singleton, Sgt. Fede, and Lt. Palumbo, the "officers

voluntarily emptied all the pockets of their vests, patrol jackets, and pants and rolled up their pant

legs."  (Id. at 7.) (emphasis added).

Furthermore, it is significant that Lt. Gibbs of IAB reported that Officer Ryan indicated to

him in an interview conducted on April 30, 2010, that he and Officer Gwynn "voluntarily

emptied their pockets to show they had none of the alleged missing money."  (Id. at 9.) (emphasis

added).  This statement is in obvious contrast to Officer Ryan's current claim that their consent

was not voluntary.  Moreover, Officer Gwynn, in his April 30, 2010 interview with IAB,

confirmed Capt. Singleton's testimony that he was actually trying to assist his officers in proving their innocence by asking them to show what was in their pockets.  Officer Gwynn indicated to IAB that Capt. Singleton "explained it would be in their best interest to empty their pockets and show that they had none of the alleged missing money." (Id. at 10.)  He also testified at his deposition that Capt. Singleton told him and Officer Ryan that "it would be beneficial to you to show you don't have the money on your right now."[8]  (Pls.' Resp. Mot. Summ. J., Ex. 1 at 61.)

We, thus, find the Plaintiffs voluntarily consented to any search that they claim was conducted on them while in Capt. Singleton's office, and were free to leave that office at any time.  We further find that, even viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could not return a verdict in favor of the Plaintiffs and, accordingly, summary judgment is granted in favor of all Defendants.[9]

### C.  The City

Plaintiffs also name the City as a Defendant in the caption of their Complaint.

_____

[8]We note that with regard to Sgt. Fede, Lt. Palumbo, and Sgt. Kelly, Officers Gwynn and Ryan testified that none of these officers had much to say to them while they were in Capt. Singleton's office. Officer Gwynn testified that "Captain Singleton was giving all the  - - basically the main person talking, directing." (Pls.' Resp. Mot. Summ. J., Ex. 1 at 66-67.)  Officer Ryan testified that Capt. Singleton was doing all the "talking for the most part."  (Id., Ex. 2 at 30.)  He added that the other officers in Capt. Singleton's office "didn't say much."  (Id. at 36.)

[9]Moreover, we also find that Commissioner Ramsey, Capt. Singleton, Lt. Palumbo, Sgt. Fede, and Sgt. Kelly would all be entitled to qualified immunity in this case.  "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'"  Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'"  Id.  Here, as discussed, none of these Defendants violated any of the Plaintiffs' constitutional rights and, thus, they are entitled to this immunity.

However, in the Complaint itself, the only mention of the City is the following: "Plaintiff [sic] contends that the deprivation and retaliation as identified above were done by the Defendants who at all times were acting . . . Under a Policy, Practice, or Custom of the City of Philadelphia."  (Compl. ¶ 11.)

"A municipality cannot be held liable solely because it employs a tortfeasor."  Monell v. N.Y. City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978).  Instead, the plaintiff must assert that an actual policy or custom of the municipality was the cause of the constitutional deprivation.  Id. In order to sufficiently allege "custom" for Monell purposes, a plaintiff must allege that the "practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."  Id.   A municipal custom is a "persistent and widespread" practice of municipal action that is "so permanent and well settled as to constitute a custom or usage with the force of law."  Id.   It is well established that "[p]roof of a single instance of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  City of Okla. City v. Tuttle, 471 U.S. 808, 820 (1985); Brown v. City of Pittsburgh, 586 F.3d 263, 292 (2009).

Here, any claim against the City that can be interpreted from Plaintiffs' Complaint is dismissed because the Plaintiffs have failed to present any evidence of any municipal policy or custom on the part of the City that it conducts illegal searches and seizures upon its officers that are accused of crimes on the job.  In addition, the evidence of record establishes that no constitutional violations were committed.

21

## II.     State Claims[10]

### A.     False Imprisonment

Plaintiffs also bring a state law claim against the Defendants for false imprisonment.  The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention.  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).

Here, for the same reasons stated above, we find that Plaintiffs were not detained in Capt. Singleton's office on December 15, 2009, as they were repeatedly advised of their right to leave at any time, and chose not to do so.  Thus, this claim is dismissed.

### B.     Overtime Wage Claim

Lastly, Plaintiffs allege that Defendants violated the Wage Claim Act, 43 P.S. § 333.101 et. seq., by not paying them overtime compensation on December 15, 2009.  (Comp. ¶¶ 38, 39.) This claim, however, is without merit since the record indicates that both Plaintiffs were paid for two hours of overtime on this date.

There is no question here that Officers Gwynn and Ryan's regular shifts on this date were from 10 a.m. to 6 p.m.  (Pls.' Mot. Summ. J., Ex. 1 at 91.)  In addition, there is no question that the officers remained in Capt. Singleton's office past their regular shifts from 6 p.m. to approximately 8:00- 8:15 p.m. while they waited for IAB to arrive to interview them.  (Id. at 92.)

---

[10]We note that Plaintiffs make a state claim alleging Fourth Amendment unreasonable search and seizure through the Fourteenth Amendment.  An individual's liberty interest in personal security, which is protected by the due process clause of the Fourteenth Amendment, includes the right to be "free from, and to obtain judicial relief for, unjustified intrusions on personal security."  Ingraham v. Wright, 430 U.S. 651, 673 (1977).  However, Plaintiffs' claims under the Fourteenth Amendment must be dismissed for the same reasons as Plaintiffs' Fourth Amendment claims because they gave repeated consent to Defendants' requests in Capt. Singleton's office.

The evidence of record indicates that Plaintiffs were paid for this overtime.  The PPD uses a system called daily attendance reports ("DAR") to track an employee's status during any given work day for compensation reasons.  If an employee works overtime and is paid for it, that payment is recorded in the DAR report, along with the reason for the overtime.

Officer Gwynn was shown a DAR report at his deposition with his name on it for December 15, 2009, and he acknowledged that it indicated that he was paid for two overtime hours with the remark "IAB interview" next to it.  (Id. at 91.)  In addition, Sgt. Fede, Lt. Palumbo, Capt. Singleton stated in their Affidavits that Plaintiffs were paid two hours of overtime for the overtime they worked on December 15, 2009.  (Defs.' Mot. Summ. J., Ex. 5 at 4; Ex. 3 at 18; Ex. 1 at 7.)  Moreover, Capt. Singleton testified, in response to the question of whether the officers got paid for the overtime they put in that day, that " I checked to see if they, in fact, got paid and they, in fact, got paid."  (Pls.' Mot. Summ. J., Ex. 7 at 47.)  Singleton also testified that he personally checked the officers' DARs for this date.  Id.  Accordingly, summary judgment is granted for this claim as well.

## IV.    CONCLUSION

We find that Plaintiffs' filing of grievances with their union for being assigned to the DRP a day after the complaint was lodged against them is not an act protected under the Petition Clause of the First Amendment and, thus, Plaintiffs' claims for retaliation fail.  We are also of the opinion that a reasonable jury, viewing the evidence in a light most favorable to Officers Gwynn and Ryan, could not find that any Defendant violated their Fourth or Fourteenth Amendment rights.  Furthermore, we find that Defendants' actions in investigating the

complaints made against Plaintiffs were reasonable under the O'Connor standard.  480 U.S. at 725-26.  Lastly, we find that Plaintiffs' state claims for false imprisonment and wage loss are without basis in the record.  Accordingly, we grant summary judgment in favor of all Defendants on all of Plaintiffs' claims.

An appropriate Order follows.